**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW HOLTZ, Derivatively and on Behalf LULULEMON ATHLETICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CALVIN MCDONALD, MEGHAN FRANK, MARTHA MORFITT, DAVID MUSSAFER, MICHAEL CASEY, SHANE GRANT, KATHRYN HENRY, ALISON LOEHNIS, ISABEL MAHE, JON MCNEILL, EMILY WHITE, and TERI LIST <br><br> Defendants, <br><br> and <br><br> LULULEMON ATHLETICA, INC., <br><br> Nominal Defendant. | Case No. 1:24-cv-8572 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Matthew Holtz ("Plaintiff"), by and through his undersigned attorneys, derivatively on behalf of Nominal Defendant Lululemon Athletica, Inc. ("Lululemon" or the "Company"), files this shareholder derivative complaint against Calvin McDonald, Meghan Frank, Martha Morfitt, David Mussafer, Michael Casey, Shane Grant, Kathryn Henry, Teri List, Alison Loehnis, Isabel Mahe, Jon McNeill, and Emily White (collectively, the "Individual Defendants") for, *inter alia,* breaches of their fiduciary duties in their capacity as directors and/or officers of Lululemon. Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia,*

1

the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published and regarding Lululemon, news reports, securities analysts' reports and advisories about the Company, related filings in other litigations, and other publicly available documents.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Lululemon against the Individual Defendants, certain of Lululemon's officers and directors, seeking to remedy their violations of federal law and breaches of fiduciary duty that have occurred from at least December 7, 2023 to July 24, 2024 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Lululemon and its shareholders.

2.      Lululemon is an apparel retailer that focuses on high-quality, performance-based gear for men and women. The Company was founded in 1998 by Chip Wilson in Vancouver, Canada, originally as a design studio and yoga studio. Since its early days, it has expanded its product range and international presence, becoming a major player in the global activewear market. Lululemon operates stores in North America, Europe, Asia, and Oceania, with over 500 locations globally.

3.      The Company reports sales and revenue in three geographic segments: The Americas, China Mainland, and Rest of World. The Americas (specifically, the United States and Canada) represents the majority of the Company's revenue. In fiscal year 2023, Lululemon's net revenue in the three geographic segments was $9.6 billion of which the Americas contributed 79% amounting to $7.6 billion. In fiscal year 2022, Lulu's net revenue in the three geographic segments

was $8.1 billion, of which the Americas contributed 84.1% amounting to $6.8 billion. And in fiscal year 2021, Lulu's net revenue in the three geographic segments was $6.2 billion, of which the Americas contributed 84.7%, amounting to $5.29 billion.

4.      As shown in the 2024 proxy, sales in the Americas represented the majority of the Company's revenue.

5.      On March 21, 2024, after market close, Lululemon released a press statement revealing its financial results for the fourth quarter and full year ending January 28, 2024. The report highlighted stagnating growth in the Americas region. Net revenue in the Americas increased by only 9% in the fourth quarter and 12% for the full fiscal year 2023, a noticeable slowdown compared to the 29% growth seen in the same period the previous year and the 12% growth reported in the prior quarter.

6.      In response to this news, the Company's share price fell $75.65, or 15.80%, to close at $403.19 per share on March 22, 2024, on unusually heavy trading volume.

7.      On July 9, 2024 Lululemon launched its Breezethrough line. However, shortly after its release, the collection faced significant criticism from customers, who found the design unflattering. Due to this feedback, Lululemon paused the sales of the Breezethrough line just a few weeks later to make design adjustments.

8.      Approximately two weeks after the launch of the Breezethrough line, on July 24, 2024, at approximately 3:05pm EST, Bloomberg reported that several analysts suggested Lululemon's inventory allocation appeared inconsistent, especially regarding the Breezethrough leggings, which were launched earlier that month both in-store and online.

9.      Following this news, the Company's stock price fell $9.31, or 3.3%, to close at $272.06 per share on July 24, 2024, on unusually heavy trading volume.

10.     Before the market opened on July 25, 2024, Bloomberg reported that a Lululemon spokesperson told the agency that the Company "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience."

11.     Following this news, the Company's share price fell $24.74, or 9.09%, to close at $247.43 per share on July 25, 2024, on unusually heavy trading volume.

12.     On July 26, 2024, JPMorgan reduced Lululemon's stock price target from $457 to $338 due to the concerns about product execution, which compounded existing issues regarding color palette and in-stock items.

13.     As a result of the foregoing, Lululemon, its Chief Executive Officer, and its Chief Financial Officer have been named defendants in the related federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York by investors who allege they were damaged when they purchased Lululemon shares during the Relevant Period, captioned *Patel v. Lululemon et al.*, 1:24-cv-06033-ALC (S.D.N.Y) (the "Securities Class Action").

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§78n(a) and Rule 14a-9 (17 C.F.R. §240.142-9) promulgated thereunder by the SEC.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

the United States mail, and the facilities of a national securities market.

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

### Plaintiff

20.    Plaintiff is, and has been at all relevant times, a shareholder of Lululemon.

### Nominal Defendant

21.    Nominal Defendant Lululemon is incorporated under the laws of Delaware, with its principal executive offices located at 1818 Cornwall Avenue, Vancouver, British Columbia, Canada, V6J 1C7. Lululemon common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "LULU."

### Individual Defendants

22.    Defendant Calvin McDonald ("McDonald") has served as Chief Executive Officer and a member of the Board since August 2018. According to the proxy statement filed by Lululemon with the SEC on April 25, 2024 (the "2024 Proxy"), McDonald received $16,494,777

in compensation from the Company in 2023, and $15,663,837 in compensation from the Company

in 2022. Additionally, McDonald is named as a defendant in the Securities Class Action.

23.     The Company's 2024 Proxy Statement stated the following about Defendant

McDonald:

> Calvin McDonald was appointed chief executive officer of lululemon and a member of our board of directors in August 2018. Prior to joining lululemon, Mr. McDonald served for five years as president and chief executive officer of Sephora Americas, a division of the LVMH group of luxury brands. Prior to joining Sephora in 2013, Mr. McDonald spent two years as president and chief executive officer of Sears Canada. Prior to his tenure at Sears Canada, Mr. McDonald spent 17 years at Loblaw Companies Limited, a grocery and pharmacy leader in Canada. Mr. McDonald is on the board of directors of The Walt Disney Company. Mr. McDonald received an MBA from the University of Toronto, and a Bachelor of Science degree from the University of Western Ontario.

24.     During the Relevant Period, Defendant McDonald made the following sales of

stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/18/2023 | 25,000 | $497.50 | $12,437,539 |
| **Total Shares Sold** | 25,000 | **Total Proceeds** | $12,437,539 |

25.     Defendant Meghan Frank ("Frank") has served as Chief Financial Officer since

November 2020. She joined Lululemon in 2016 as the senior vice president, financial planning

and analysis, and served as interim co-chief financial officer from April 2020 until her appointment

to chief financial officer. According to the 2024 Proxy, Frank received $4,091,722 in

compensation from the Company in 2023, and $3,487,838 in compensation from the Company in

2022.

26.     The Company's 2024 Proxy Statement stated the following about Defendant Frank:

> Meghan Frank has served as our chief financial officer since November 2020. She joined  lululemon in 2016 as the senior vice president, financial planning and

analysis, and served as interim co-chief financial officer from April 2020 until her appointment to chief financial officer. Ms.. Frank is now responsible for leading finance, tax, treasury, investor relations, asset protection, facilities, transformation, and strategy functions of the business. Prior to joining lululemon, Ms. Frank held senior finance and merchandise planning roles at Ross Stores and J. Crew, where she served for nearly a decade. She earned her Bachelor of Arts degree from Colgate University.

27.    During the Relevant Period, Defendant Frank made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/18/2023 | 1,553 | $500.00 | $776,500 |
| Total Shares Sold | 1,553 | Total Proceeds | $776,500 |

28.    Defendant Martha Morfitt ("Morfitt") has served as a member of the Board since December 2008 and has been the chair of the board since March 2022. Morfitt is also a member of the Audit Committee. According to the 2024 Proxy, Morfitt received $417,090 in compensation from the Company in 2023.

29.    The Company's 2024 Proxy Statement stated the following about Defendant Morfitt:

Marti Morfitt has been a member of our board of directors since December 2008, and has been the chair of the board since March 2022.

She has served as a principal of River Rock Partners, Inc., a business and cultural transformation consulting firm, since 2008. Ms. Morfitt served as the chief executive officer of Airborne, Inc. from October 2009 to March 2012. She served as the president and chief executive officer of CNS, Inc., a manufacturer and marketer of consumer healthcare products, from 2001 through March 2007. From 1998 to 2001, she was chief operating officer of CNS, Inc. Ms. Morfitt currently serves on the board of directors of Graco, Inc. and Olaplex Holdings, Inc. She served on the board of directors of Mercer International Inc., a forest products company, from 2017 to 2020, and Life Time Fitness, Inc. from 2008 to 2015.  She received her HBA from the Richard Ivey School of Business at the University of Western Ontario, and an MBA from the Schulich School of Business at York University.

30.    Defendant David Mussafer ("Mussafer") has served as a member of the Board and

the lead director since September 2014. According to the 2024 Proxy, Mussafer received $320,424

in compensation from the Company in 2023.

31.    The Company's 2024 Proxy Statement stated the following about Defendant

Mussafer:

> David Mussafer is the lead director and has been a member of our board of directors since September 2014.
>
> Mr. Mussafer also served as a director of lululemon from 2005 until 2010. Mr. Mussafer is chairman and managing partner of Advent International L.P. which he joined in 1990. Prior to Advent, Mr. Mussafer worked at Chemical Bank and Adler & Shaykin in New York. Mr. Mussafer has led or co-led more than 30 buyout investments at Advent across a range of industries. Mr. Mussafer currently serves on the board of directors of Olaplex Holdings Inc. Mr. Mussafer previously served as a director of a number of public and private companies over the course of his career at Advent, including First Watch Restaurants, Inc. from 2019 to 2021. Mr. Mussafer holds a BSM, cum laude, from Tulane University and an MBA from the Wharton School of the University of Pennsylvania.

32.    Defendant Michael Casey ("Casey) has served as a member of the Board since

October 2007. Casey also served as co-chair of the Board from September 2014 to April 2017, and

as chair of the Board from May 2014 to September 2014. Casey is also the Chairperson of the

Audit Committee. According to the 2024 Proxy, Casey received $297,924 in compensation from

the Company in 2023.

33.    The Company's 2024 Proxy Statement stated the following about Defendant Casey:

> Michael Casey has been a member of our board of directors since October 2007. Mr. Casey also served as co-chair of the board of directors from September 2014 to April 2017, and as chair of the board of directors from May 2014 to September 2014.
>
> He retired from Starbucks Corporation in October 2007, where he had served as senior vice president and chief financial officer from August 1995 to September 1997, and executive vice president, chief financial officer and chief administrative officer from September 1997 to October 2007. Subsequent to retirement he served as a senior advisor to Starbucks Corporation from October 2007 to May 2008, and from November 2008 to January 2015. Prior to joining Starbucks, Mr. Casey was executive vice president and chief financial officer for Family Restaurants, Inc. and

president and chief executive officer of El Torito Restaurants, Inc. He was also a member of the board of directors of the Nasdaq OMX Group, Inc. from January 2001 to May 2012. Mr. Casey graduated from Harvard College with a B.A. degree in Economics, cum laude, and Harvard Business School with an MBA degree.

34.     Defendant Shane Grant ("Grant") has served as a member of the Board since November 2023. Grant is also a member of the Audit Committee. According to the 2024 Proxy, Grant received $49,647 in compensation from the Company in 2023.

35.     The Company's 2024 Proxy Statement stated the following about Defendant Grant:

Shane Grant has been a member of our board of directors since November 2023.

He currently serves as Group Deputy CEO, CEO Americas and EVP Dairy, Plant-Based and Global Sales at Danone. In his role, Mr. Grant is responsible for leading the Danone business across North America and Latin America, as well as Danone's largest global category in Dairy and Plant-Based and global Customer and Commercial Leadership. Mr. Grant spent nearly 20 years with The Coca-Cola Company, where he held global and operating leadership roles in category, commercial, and general management. Before joining The Coca-Cola Company, he held customer, supply chain, and brand management positions at Unilever. Mr. Grant serves on the board of directors of the US Food Industry Association (FMI), the executive committee of the Consumer Brand Association, and is a member of the American Heart Association CEO roundtable. He is also a Member of World 50. Mr. Grant holds Business and Arts degrees from the University of Auckland.

36.     Defendant Kathryn Henry ("Henry") served as a member of the Board since January 2016. Henry is also a member of the Audit Committee. According to the 2024 Proxy, Henry received $269,590 in compensation from the Company in 2023.

37.     The Company's 2024 Proxy Statement stated the following about Defendant Henry:

Kathryn Henry has been a member of our board of directors since January 2016.

Ms. Henry is co-founder and advisor of LightBrite, where she also served as CEO from January 2022 to February 2023. From 2015 to 2022, she served as a strategic consultant for retail and technology companies, in addition to venture capital, investment and consulting firms seeking executive level guidance. Ms. Henry previously served as chief information officer, logistics & technology operations for the company. Prior to joining lululemon in 2010, Ms. Henry worked at Gap,

Inc., where she served as vice president and chief information officer of international IT and Gap North American and was responsible for the systems support of key international growth initiatives. Previously, she was vice president of Dockers Business Divestiture and vice president of global IT strategy & development at Levi Strauss & Co. Ms. Henry was selected as a Global CIO Top 25 Breakaway Leader in 2013, and was a member of the National Retail Federation CIO council during her tenure with lululemon.

38.     Defendant Alison Loehnis ("Loehnis") served as a member of the Board since January 2022. Loehnis is also a member of the Audit Committee. According to the 2024 Proxy, Loehnis received $257,090 in compensation from the Company in 2023.

39.     The Company's 2024 Proxy Statement stated the following about Defendant Loehnis:

Alison Loehnis has been a member of our board of directors since January 2022.

Since October 2022, Ms. Loehnis has been ad-interim CEO and president of Luxury and Fashion at Yoox Net-a-Porter where she is responsible for Net-a-Porter, Mr. Porter and the Outnet businesses, and where she was president of the luxury division from 2015 until 2021. She has held several leadership roles with expanding responsibility since she joined the company in 2007 and has been instrumental in the conception and launch of major initiatives including TheOutnet.com and MrPorter.com. Previously, Ms. Loehnis held positions with LVMH, Hachette Filipacchi and The Walt Disney Company, after starting her career with Saatchi & Saatchi. Ms. Loehnis received a degree in Art History from Brown University.

40.     Defendant Isabel Mahe ("Mahe") has been a member of the Board since November 2022. According to the 2024 Proxy, Mahe received $272,773 in compensation from the Company in 2023.

41.     The Company's 2024 Proxy Statement stated the following about Defendant Mahe:

Isabel Mahe has been a member of our board of directors since November 2022.

Ms. Mahe currently serves as Vice President and Managing Director of Greater China at Apple Inc. She joined Apple in 2008 as Vice President of Wireless Technologies and oversaw the development of cellular, Wi-Fi, Bluetooth, NFC, location and motion technologies for products across the business. Prior to Apple, she served as Vice President of Wireless Software Engineering at Palm and held key managerial positions at other technology-focused organizations. Ms. Mahe

served on the board of directors of Starbucks from 2019 to 2023 and was named to Fortune's 50 Most Powerful Women list in 2021 and 2022. She received a Bachelor of Applied Science and a Masters of Engineering from Simon Fraser University in British Columbia, Canada and an MBA from the University of California, Berkeley.

42.    Defendant Jon McNeill ("McNeill") has been a member of the Board since April 2016. According to the 2024 Proxy, McNeill received $254,590 in compensation from the Company in 2023.

43.    The Company's 2024 Proxy Statement stated the following about Defendant McNeill:

Jon McNeill has been a member of our board of directors since April 2016.

Since January 2020, Mr. McNeill has served as chief executive officer of DVX Ventures. He served as chief operating officer of Lyft, Inc. from March 2018 to July 2019. From September 2015 to February 2018, he served as president of Tesla Motors Inc., overseeing customer-facing operations. Prior to joining Tesla, he was the chief executive officer of Enservio, Inc., a software company, from 2006 until 2015, and found of multiple technology and retail companies, including TruMotion, Sterling, First Notice Systems and Trek Bicycles Stores, Inc. He serves on the board of directors of General Motors. Mr. McNeill began his career at Bain & Company. He is a graduate of Northwestern University.

44.    Defendant Emily White ("White") has been a member of the Board since November 2011. According to the 2024 Proxy, White received $290,480 in compensation from the Company in 2023.

45.    The Company's 2024 Proxy Statement stated the following about Defendant White:

Emily White has been a member of our board of directors since November 2011.

She has served as President of Anthos Capital, a Los Angeles-based investment firm since 2018. Prior to Anthos, Ms. White was chief operating officer at Snap, Inc. from January 2014 to March of 2015. Prior to joining Snap, Ms. White held several leadership roles at Facebook Inc. from 2010 to 2013 including as Director of Local Business Operations, Director of Mobile Business Operations and Head of Business Operations at Instagram. From 2001 to 2010, Ms. White worked at Google where she ran North American Online Sales and Operations, Asia Pacific & Latin America business and the Emerging Business channel. Ms. White is on the

boards of directors of Olaplex Holdings Inc., Guayaki Sustainable Rainforest Products, Inc., and Gretel.ai. She was on the board of directors of Graco, Inc. from 2017 to 2022. Ms. White has also served on the boards of the National Center for Women in I.T., a non-profit coalition working to increase the participation of girls and women in computing and technology, and X-Prize, a non-profit focused on creating breakthroughs that pull the future forward. She received a BA in Art History from Vanderbilt University.

46.     Defendant Teri List ("List") has been a member of the Board since March 2024. List is also a member of the Audit Committee.

47.     The Company's 2024 Proxy Statement stated the following about Defendant List:

Teri List has been a member of our board since March 2024.

Ms. List served as executive vice president and chief financial officer of Gap, Inc., from January 2017 until her retirement in June 2020. Prior to joining the Gap, she served as chief financial officer at DICK's Sporting Goods and Kraft Food Group, overseeing organizations across finance, accounting, real estate, legal, and information technology. Prior to those roles, Ms. List spent nearly 20 years with Procter & Gamble culminating in the role of SVP and Treasurer. She began her career in public accounting at Deloitte LLP. She currently serves on the board of directors of Danaher Corporation, Microsoft Corporation and Visa Inc. Ms. List has a bachelor's degree in accounting and an honorary doctorate from Northern Michigan University and is a certified public accountant.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors, and/or fiduciaries of Lululemon and because of their ability to control the business and corporate affairs of Lululemon, the Individual Defendants owed Lululemon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

49.     The Individual Defendants were and are required to use their utmost ability to control and manage Lululemon in a fair, just, honest, and equitable manner.

50.     The Individual Defendants were and are required to act in furtherance of the best interests of Lululemon and its shareholders to benefit all shareholders equitably.

51.     Each director and officer of the Company owes Lululemon and its shareholders the

12

fiduciary duty to exercise good faith and diligence in the administration of the Company.

52.     As fiduciaries of Lululemon, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

53.     The officers and directors of Lululemon were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

54.     Each Individual Defendant under their position as officers of Lululemon, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

55.     As Lululemon's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

56.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

57.     As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

58.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)    Ensure that the Company was operated in a diligent, hones, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the Lululemon's Code of Conduct and internal guidelines;

b)    Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

c)    Remain informed as to how Lululemon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

d)    Establish and maintain systematic, accurate records and reports of the business and internal affairs of Lululemon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lululemon's operations would comply with all laws and Lululemon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)    Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was

required by law to disseminate.

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set fort above.

59. Each of the Individual Defendants also bore a duty of loyalty to Lululemon and its shareholders, mandating the prioritizations of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

60. During the pertinent times, the Individual Defendants served as agents for each other and for Lululemon, always operating within the parameters of their agency.

61. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Lululemon, were privy to detrimental, confidential information concerning the Company.

62. Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Lululemon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the

true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

64. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

65. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

66. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Lululemon, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

67. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

68. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Lululemon, and at all times operated within the course and scope of that agency.

## LULULEMON'S GLOBAL CODE OF BUSINESS CONDUCT AND ETHICS

69. The Individual Defendants, like all employees, directors and officers of the

Company, are required to comply with Lululemon's Global Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct state, in pertinent part, the following:

**01. We comply with all laws, and in doing so we contribute to healthy communities.**

We are all expected to comply with the law. This includes not only following the laws of our home market, but also complying with local laws when visiting different markets or transacting business with individuals, organizations, or guests located in a different market.

\* \* \*

**05. Personal responsibility is the path to success.**

\* \* \*

**Accurate Records**

We must follow our system of internal controls and disclosure controls and ensure that corporate records and all securities filings are timely, legitimate, and accurate. Creating false or misleading records is prohibited, and all financial accounts, reports, and records are expected to be fair, accurate, and appropriately authorized.

\* \* \*

**Speaking on lululemon's Behalf**

Unless specifically authorized to do so, one cannot speak publicly on lululemon's behalf or publicly disclose proprietary or confidential information about lululemon, including on social media. Those permitted to speak on our behalf must be truthful, accurate, and respectful in their communications and maintain any duty of confidentiality.

**06. Questions, concerns, and assisting with investigations.**

\* \* \*

**Waivers**

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

**Consequences for Violating the Code**

Violation of any law or Code is a serious matter. Any employee, contractor, director, r officer who compromises or violates any applicable law or the Code may be subject to disciplinary action, up to and including, termination of employment, loss of employment-related benefits, and, if applicable, criminal or civil proceedings.

* * *

**07. Reporting a violation of the Code and non-retaliation.**

**Reporting Violations**

If you suspect that there has been a violation of the Code, report it through the following channels:

- Your people leader
- Another people leader
- Your People and Culture partner
- Any member of the Legal department
- Anyone on our Senior Leadership team
- The integrity line: or
- Our Audit Committee Chair:
  Chair, Audit Committee
  1818 Cornwall Avenue
  Vancouver, British Columbia V6J 1C7
  auditcommitee@lululemon.com

* * *

**Government Investigations**

Nothing in the Code precludes an employee from reporting a violation of law to a government agency or cooperating in a government investigation.

* * *

<u>**LULULEMON'S CORPORATE GOVERNANCE GUIDELINES**</u>

70.    Lululemon's Corporate Governance Guidelines (the "Guidelines") emphasize the Board's responsibility to ensure transparency, integrity, and accountability in all communications and disclosures made by the company. According to the Guidelines, the Board is explicitly tasked with overseeing management's performance and ensuring that stockholders' interests are

18

protected:

### Role of Board and Management

The Board of Directors (the "Board"), which is elected by the stockholders, is the ultimate decision-making body of lululemon athletic inc. (the "Company") except with respect to those matters reserved to the stockholders. The Board selects the senior management team, which is charged with the day-to-day conduct of the Company's business. Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately monitors its performance.

The fundamental role of the members of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. In fulfilling that responsibility, the directors may reasonably rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors.

Directors are expected to attend Board and applicable committee meetings, absent extraordinary circumstances, and to review meeting materials in advance of such meetings. Directors are encouraged to attend the Company's annual meetings of stockholders.

* * *

71.     In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Casey (Chair), Grant, Henry, List, Loehnis, and Morfitt ("Audit Committee Defendants") owed specific additional duties to Lululemon. Specifically, the Audit Committee Charter States:

### PURPOSE

The Audit Committee (the "Committee") is a standing committee of the Board of Directors of lululemon athletica inc. (the "Company"). The primary purpose of the Committee is to assist the Board of Directors in undertaking and fulfilling its oversight responsibilities in connection with:

- Reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports;

- Reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics;

- Reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company;

- Reviewing the Company's Global Risk & Advisory Services function;

- Monitoring compliance with legal and regulatory requirements and overseeing the Company's corporate compliance program;

- Monitoring the independence and performance of the Company's independent public accountants;

- Overseeing the Company's financial risk assessment and risk management policies, procedures and practices;

- Overseeing the Company's enterprise risk assessment and management policies, procedures and practices (including regarding those risks related to information security, cyber security and data protection); and

- Providing effective communication among the Board of Directors, senior and financial management and Company's independent public accountants.

\* \* \*

## DUTIES AND RESPONSIBILITIES

In furtherance of the Committee's responsibilities, the Committee's policies and procedures will remain flexible to best react to changing conditions and to ensure to the Board of Directors and stockholders that the corporate accounting and reporting practices of the Company are in accordance with applicable requirements and standards. Thus, the following functions are a guide with the understanding that the Committee may diverge from this guide as appropriate given the circumstances.

## REVEW OF FINANCIAL REPORTS AND PRESS RELEASES

- The Committee shall review and discuss with management and the independent public accountants the audited financial statements and related footnotes to be included in the Company's Annual Report on Form 10-K (or the Annual Report to Stockholders if distributed prior to the filing of Form 10-K), prior to the filing of the Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") and review and discuss with the independent public accountants the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) and the SEC, and if applicable the Canadian securities regulatory authorities. The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

- The Committee shall review with management and the independent public accountants interim financial results to be included in the Company's quarterly reports on Form 10-Q to be filed with the SEC and, if applicable, the Canadian securities regulatory authorities, MD&A and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC prior to the Company's filing of any Form 10-Q.

- The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer, or the Company's disclosure committee or any member thereof, during their certification process for the Form 10-K or Form 10-Q and for the certifications, if applicable, required to be filed with the Canadian securities regulatory authorities, as appropriate. In addition, the Committee shall discuss with the Company's management and independent public accountants whether the Company's quarterly financial statements as well as significant events, transactions and changes in accounting estimates were considered by the independent public accountants (after performing their required quarterly review) to have affected the quality of the Company's financial reporting. Such reviews will occur prior to the Company's filing of the Form 10-K, Form 10-Q and, to the extent practicable, prior to the quarterly earning release. The Committee shall review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), ad well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee. Such discussion may be general in nature (consisting of discussing the types of information to be disclosed and the types of presentations to be made.)

## INDEPENDENT PUBLIC ACCOUNTANTS

- The Committee has responsibility for the retention and termination of the Company's independent public accountants and to set its fees.

- The Committee shall review with the independent public accountants the scope of the prospective audit, the estimated fees therefor and such other matters pertaining to such audit as the Committee may deem appropriate.

- The Committee shall review written disclosures received from the independent auditors regarding the auditors' independence, as required by the applicable requirements for the PCAOB, and shall discuss with the independent auditors their independence.

- The Committee shall pre-approve all auditing services and permitted non-audit services (including the fees fir such services and terns thereof) to be performed for the Company or its subsidiary entities by its independent public accountant in one

of two methods. For all auditing services, the engagement to render the services would be entered into pursuant to pre-approval policies and procedures established by the Committee, provided (i) the policies and procedures are detailed as to the services to be performed, (ii) the Committee is informed of each service, and (iii) such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. For non-audit services, the engagement to render the services would be presented to and pre-approved by the Committee (subject to the de minimis exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act that are approved by the Committee prior to the completion of the audit). The Committee's chairperson will have the authority to grant pre-approvals of audit and permissible non-audit services by the independent public accountants, and all pre-approvals by the chairperson must be presented to the full Committee at its next scheduled meeting.

- At least annually, the Committee shall receive and review a report by independent public accountants describing:

o The Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;

o Any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and

o All relationships between the independent public accountants and the Company. The report shall include a statement as to whether the relationships between the independent public accountant and the Company will impact no the independent public accountant's objectivity and independence.

- The Committee shall obtain the independent public accountant's assurance that the audit was conducted in a manner consistent with the Exchange Act, and other provisions of applicable law.

- The Committee shall review and discuss quarterly reports from the Company's independent public accountants regarding:

o All critical accounting policies and practices to be used;

o All alternative disclosures and treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent public accountant; and

- All material written communications between the independent public accountants and management, such as any management letter or schedule of unadjusted differences.

- The Committee shall recommend to the Board of Directors policies for the Company's hiring of partners, employees, former partners or former employees of the independent public accountants who participated in any capacity in the audit of the Company.

## FINANCIAL REPORTING, ACCOUNTING PRINCIPLES AND INTERNAL CONTROL MATTERS

- The Committee shall advise management and the independent public accountants that they are expected to provide the Committee with a timely analysis of significant financial reporting, accounting, or internal control matters.

- The Committee shall review with the Company's management and the independent public accountants their judgements about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.

- The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall adopt and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting c9ntrols or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee may take all other appropriate action, including notifying the SEC, and, if applicable, the Canadian securities regulatory authorities, if the Company fails in any material respect to implement an appropriate response that the Committee has recommended for adoption by the Company.

## OVERSIGHT OF THE GLOBAL RISK & ADVISORY SERVICES FUNCTION

- The Committee shall review the qualification of the Global Risk & Advisory Services function and concur on the appointment and replacement of the senior Global Risk & Advisory Services executive. Additionally, the Committee may

review periodically the staffing plans, department responsibilities, and budget.

- The Committee shall review the Global Risk & Advisory Services function of the Company, including its independence and authority in the Company's reporting processes, the proposed audit plan for the coming year, and the coordination of such plans with the independent public accountants.

- The Committee shall annually review any charter setting out the responsibilities of the Global Risk & Advisory Services function and approve any changes thereto as the Committee deems necessary or appropriate.

## RISK OVERSIGHT

- The Committee shall review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements.

- The Committee shall meet periodically, but no less than quarterly, with management, the Company's Global Risk & Advisory Services team and the Company's independent pubic accountants to review and discuss the Company's significant financial risk exposures and the steps that management has take to monitor, control and report such risks.

- The Committee shall regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security and data protection).

- The Committee shall review and monitor the Company's cybersecurity and information security policies and procedures regarding cybersecurity and information security, and shall regularly report to the Board of Directors at such intervals as determined by the Committee the substance of those reviews and, as necessary, recommend to the Board of Directors such actions as the Committee determines necessary or advisable.

- The Committee shall report its risk oversight activities to the Board of Directors on a regular basis, but no less than annually, and in that regard shall make such recommendations to the Board of Directors with respect to risk assessment and risk management as the Committee may deem necessary or appropriate.

## COMMITTEE REVIEW

- The Committee shall conduct an annual review and evaluation of its own performance. The Committee shall prepare, and report to the Board of Directors the results of, such annual performance evaluation, which shall compare the performance of the Committee with the requirements of this Charter.

## CHARTER REVIEW

- The Committee shall review and reassess the adequacy of this Charter on an annual basis and recommend any proposed changes to the Board of Directors for approval.

## ONGOING MATTERS

- The Committee shall prepare the report required by the rules of the SEC regarding the Committee, to be included in the Company's annual proxy statement and, if applicable, any reports required to be filed with the Canadian securities regulatory authorities. In furtherance thereof, the Committee will include a statement within such report on whether the Committee has recommended that the financial statements be included in the Form 10-K and ensure that a copy of the Committee's Charter is publicly available to the extent required in accordance with applicable SEC rules.

- The Committee shall review with the Company's counsel legal matters that may have a material impact on the financial statements, the Company's policies and any material reports or inquiries received from regulators or governmental agencies.

- The Committee shall periodically review, and make any appropriate recommendations to the Board of Directors concerning updates or changes to the Company's Global Code of Business Conduct and Ethics (the "Code"), and ensure that management has established a system to enforce the Code. The Committee shall also review the procedures established by the Company that monitor the compliance by the Company with its loan and indenture covenants and restrictions. The Committee shall periodically review the effectiveness of the Company's corporate compliance program.

- The Company shall periodically review the Related Transaction Policies and Procedures and review and approve any transactions between the Company and related parties in accordance with that policy.

- The Committee shall review legislative and regulatory developments affecting environmental, social and governance ("ESG") reporting, at least annually, including sustainability and climate-related disclosures within the financial reporting framework, The Committee will oversee the reporting and auditing of any mandatory sustainability and climate-related disclosures that require information to be presented on a global consolidated basis.

- The Committee shall hold such meetings as may be necessary or appropriate with the Company's management and independent public accountants in separate sessions to discuss any matters that the Committee or each of these groups believe should be discussed privately. Such special meetings as may be called by the chairperson of the Committee or at the request of the Company's management or independent public accountants.

- To the extent it deems necessary or appropriate, the Committee may also meet with the Company's investment bankers and any other advisors to the company, as appropriate, to carry out its duties.

- The Committee shall consider such other matters in relation to the financial affairs of the Company and its accounts, and in relation to the audit of the Company, as the Committee may, in its discretion, determine to be advisable.

## LIMITATION ON COMMITTEE'S ROLE

Although the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with the generally accepted accounting principles. This is the responsibility of management and the independent public accountants.

The Committee recognizes that the Company's management is responsible for preparing the Company's financial statements, and the independent public accountants are responsible for auditing or reviewing those financial statements in compliance with applicable law. The Committee also recognizes that management and independent public accountants have more time, knowledge and more detailed information on the Company than do Committee members. Consequently, in carrying out its oversight responsibility, the Committee will not provide any special assurances as to the Company's financial statements or any professional certification as to the independent public accountants' work. In addition it is not the duty of the Committee to conduct investigations, to assure that any disagreements, if any, between management and the independent public accountants are satisfactorily resolved, or to assure compliance with laws and regulations.

## ACCESS TO RECORDS AND RESOURCES

The Committee will have the resources and authority necessary to discharge its duties and responsibilities. In carrying out its duties and responsibilities, the Committee shall have full access to any relevant records of the Company and may retain experts and outside consultants to advise the Committee. The Committee shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors. The Committee shall have sole authority to engage, terminate and determine the compensation and terms of engagement of any

experts, outside consultants, external legal, accounting or other advisors. The Committee may also request that any officer or other employee of the Company, the Company's outside counsel or any other person meet with ant members of, or consultants tom, the Committee.  The fees, expenses or compensation owed any person retained by the Committee and any ordinary administrative expenses of the Committee incurred in carrying out its duties and responsibilities shall be borne by the Company.

Any communications between the Committee and legal counsel in the course of obtaining legal advice will be considered privileged communications of the Company and the Committee will take all necessary steps to preserve the privileged nature of those communications.

## DELEGATION OF DUTIES

The Committee shall be entitled to delegate any or all of its duties or responsibilities to a subcommittee of the Committee, to the extent permitted by law and consistent with the Company's certificate of incorporation, bylaws, and applicable law and rules of markets in which the Company's securities then trade.

## SUBSTANTIVE ALLEGATIONS

72.     Lululemon Athletica, commonly referred to as Lululemon, is an athletic apparel retailer know for its high-quality activewear, particularly yoga and fitness gear. Lululemon's vision was to provide high-performance athletic wear primarily for women interested in yoga though it has since expanded to a broad range of activewear for both men and women.

73.     Lululemon's largest market is the United States, followed by Canada, Europe, and the Asia-Pacific region (especially China). The U.S. accounts for a significant portion of its revenue, but the brand has worked on expanding its presence internationally.

74.     Lululemon's stock began experiencing a significant decline in 2024 due to factors like a softening U.S. market, increased spending on brand awareness, and tempered earnings expectations.

75.     After a strong fiscal year performance in 2023, the Company set lower-than-expected revenue and EPS growth projections for the first quarter of 2024, which led to investor

concerns and a drop in stock value.

76.     By mid-2024, Lululemon's stock had decreased about 34% year-to-date as of April, despite long-term growth potential in its international and men's segments.

77.     Lululemon's stock started declining in early 2024 due to lower-than-expected financial guidance for the fiscal year. Although the company reported strong earnings for the fourth quarter of 2023, its outlook for 2024 fell short of investor expectations and signaled slowing momentum in the North American market.

78.     Lululemon projected revenue growth between 11-12%, below previous market forecasts of around 14%. Additionally, the Company's projected earnings per share (EPS) range of $14.00 to $14.20 missed analysts' expectations, leading to concerns about slowing U.S. sales and increasing competition within the activewear market.

79.     These conservative forecasts indicated potential challenges in Lululemon's largest market (North America) and a possible shift toward back-weighted growth in the second half of the year. The company noted a softer consumer environment in the U.S. and rising expenses aimed at increasing brand visibility, both of which could impact short-term profitability and margin expansion.

80.     Lululemon's Breezethrough line launched on July 9, 2024 with high expectations from both the Company and customers.

81.     However, the new line faced strong customer backlash over fit and design issues, leading the company to pause its sales shortly after release. Customers criticized the leggings' waistband and seam placement, describing the design as unflattering.  Although the company claimed the financial impact of this pause was negligible, analysts viewed it as indicative of broader issues with Lululemon's product innovation strategy. The incident contributed to concerns

about whether Lululemon's growth may be stalling in a saturated and competitive activewear market.

82.     Between the Relevant Period, Lululemon's stock saw a noticeable decline. The stock price dropped from around $511.29 in December 2023 to approximately $272.06 in late July, marking a decrease of roughly 46.8%.

83.     Lululemon's response to its stock decline during the Relevant Period lacked strategic clarity and did not disclose critical information on how negatively the pause of sales of the Breezethrough line had impacted the Company, and it did not fully address concerns about its premium pricing or rising competition in North America.

84.     Instead, Lululemon claimed that they were focusing on "International growth" and glossed over structural issues in its U.S. market.  This was a diversion rather than a concrete plan to resolve the underlying challenges impacting its stock value.

85.     On July 25, 2024, the Company's shares fell to $247.32 which marked the lowest level or Lululemon since early 2020.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

86.     On December 7, 2023 Lululemon released its third-quarter 2023 financial results in a press release covering the period ending October 9, 2023. The Company reported that its net revenue "increased 19% to 2.2 billion" and income from operations "decreased 4% to $338.1 million." The press release further stated, in relevant part:[1]

> Calvin McDonald, Chief Executive Officer, stated: : "This was another **strong quarter for lululemon as our innovative product offerings** and community activations continued to **powerfully resonate with our guests globally**."

87.     On December 7, 2023, the Company filed its quarterly report on Form 10-Q with

---

[1] Emphases are added unless otherwise noted.

the SEC for the period ending October 29, 2023, which confirmed the previously reported financial

results (the "3Q23 10-Q"). The 3Q23 10-Q included a purported warning regarding potential risks

to the Company, stating, in relevant part:

> **If** we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

88.     The 3Q23 10-Q asserted that the Company effectively manages its inventory

allocation, stating, in relevant part:

> **The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed.** Our inventory balance as of October 29, 2023 was $1.7 billion, a decrease of 4% from October 30, 2022.

89.     On January 8, 2024, the Company released a press statement raising its revenue and

earnings projections for the fourth fiscal quarter of 2023, ending on January 28, 2024, stating, in

pertinent part:

> lululemon athletica inc. (NASDAQ:LULU) today announced that, for the fourth quarter of fiscal 2023, the Company now expects net revenue will be in the range of $3.170 billion to $3.190 billion, representing a 14% to 15% increase compared to the fourth quarter of fiscal 2022. The previous guidance range was $3.135 billion to $3.170 billion.
>
> Diluted earnings per share are now expected to be in the range of $4.96 to $5.00 for the fourth quarter of fiscal 2023 compared to the Company's previous guidance range of $4.85 to $4.93.
>
> The Company now expects gross margin to be in the range of 58.6% to 58.7% for the fourth quarter of fiscal 2023, compared to its previous guidance of 58.3% to 58.6%. There is no change to the Company's previous guidance for selling, general, and administrative expenses or effective tax rate.
>
> Meghan Frank, Chief Financial Officer, commented: "We are pleased with our performance during the holiday season, as guests continue to respond well to our innovative and versatile product offerings. **Our sales trend remains balanced across channels, categories, and geographies, enabling us to raise our guidance for the fourth quarter and close out another strong year**."

90.     On July 26, 2024, a press release was made announcing the pause in sale of the Breezethrough line after its disastrous launch on July 9, 2024. During an earnings call on the same day, the Company Chief Executive Officer, Calvin McDonald acknowledged that customer expectations were not met, and assured investors that Lululemon would work to fast-track update designs for 2025 to better align with consumer feedback. Defendant McDonald stated, in pertinent part:

> We have made the decision to pause on sales for **now to make any adjustments necessary to deliver the best possible product experience.**

91.     The statements outlined above were materially false and/or misleading, as they failed to disclose critical adverse information regarding the Company's business, operations, and outlook. Specifically, Defendants did not inform investors that: (i) the Company was facing challenges with inventory allocation and issues in executing its color palette; (ii) that, as a result, the Company's Breezethrough product launch underperformed; (iii) due to these issues, the Company was experiencing stagnant sales in the Americas region; and (iv) as a result, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

92.     The truth began to surface on March 21, 2024, after the market closed, when Lululemon revealed stagnant growth in the Americas region, particularly in North America. On this date, the Company released a press statement disclosing its financial results for the fourth quarter and full year ending January 28, 2024. Lululemon reported that net revenue in the Americas grew by 9% during the quarter and 12% for fiscal year 2023, falling short of the 29% growth from the previous year and 12% growth in the prior quarter. Specifically, the Company reported the following, in pertinent part:

**For the fourth quarter of 2023, compared to the fourth quarter of 2022:**
- Net revenue increased 16% to $3.2 billion.
  - Americas net revenue increased 9%

* * *

  - Americas comparable sales increased 7%.

* * *

**For 2023 compared to 2022:**
- Net revenue increased 19% to $9.6 billion, or increased 20% on a constant dollar basis.
  - Americas net revenue increased 12%.

* * *

  - Americas comparable sales increased 8%, or 9% on a constant dollar basis.

* * *

During the fourth quarter, *we saw continued momentum across our channels, geographies, and merchandise categories*, driven by our teams around the world. As we step into 2024, we are focused on the *significant opportunities ahead for lululemon as we navigate the dynamic retail environment and deliver for guests through innovative new products and brand activations*."

93.    On the same day, the Company conducted an earnings call to discuss the financial results for the fourth quarter and full year ending January 28, 2024, during which Defendant McDonald stated, in pertinent part:

As I mentioned, *our sizing in particular in zero to four is something we're chasing into. Color, where we had color, it performed well. And honestly, we just did not have enough*. And both of these attributes over-index in the U.S., which is where I see the opportunity. And we're going to continue to play offense in the market. The innovation product pipeline remains very strong for this year and we have some exciting brand initiatives in addition.

Where that's showing up? *We're seeing a slowdown in traffic in the U.S.,* but it's still positive and conversion is down slightly. And I *link that to some of the product opportunities we have in the sizing and color, which as I said, we will -- we are chasing* until we will get stronger through the quarters.

94.    Following this news, the Company's share price dropped by $75.65, or 15.80%,

closing at $403.19 per share on March 22, 2024, amid unusually high trading volume.

95.    On March 21, 2024, the Company filed its annual report on Form 10-K with the SEC for the period ending January 28, 2024 (the "FY23 10-K"). The FY23 10-K confirmed the previously reported financial results and included a purported warning about the risks facing the Company, stating, in pertinent part:

> *If* we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.
>
> * * *
>
> Our results of operations *could* be materially harmed *if* we are unable to accurately forecast guest demand for our products.

96.    The FY23 10-K additionally claimed that the Company effectively manages its inventory allocation, stating, in pertinent part:

> ***The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed.*** Our inventory balance as of January 28, 2024 was $1.3 billion, a decrease of 9% from January 29, 2023. We expect our inventories to decrease during the first half of 2024 compared to the first half of 2023, and then increase in the second half of 2024 compared to the second half of 2023.

97.    On April 25, 2024, the Company released its 2023 Annual Report, highlighting its "impressive pipeline of product innovation" and its ability to effectively execute on product allocation and launches, stating, in pertinent part:

> We believe one of our competitive advantages is our ability to consistently bring newness and innovation into our assortment, and that our proprietary fabrics, innovative designs, and functional technology set us apart.
>
> ***
>
> Our design and development team continues to source technically advanced fabrics, with new feel and fit, and craft innovative functional features for our products. ***Through our vertical retail strategy and direct connection with our customers, whom we refer to as guests, we are able to collect feedback and incorporate***

*unique performance and fashion needs into our design process.* In this way, we believe we are better positioned to address the needs of our guests, helping us advance our product lines and differentiate us from our competitors.

\*\*\*

*Our operations in the Americas are core to our business and we aim to continue to grow our net revenue in this market through ongoing product innovation* and by building brand awareness.

98.     On May 21, 2024, the Company issued a press release which announced the Company was "implementing an updated and more integrated organizational structure," which was "intended to support the company's near- and long-term growth plans, accelerate product innovation, and further enable its go-to-market strategies." The press release quoted Defendant McDonald claimed that "the new structure will enable us to solve for the unmet needs of our guests in a more efficient, unique, and powerful way."

99.     On June 5, 2024, the Company issued a press release announcing its first-quarter 2024 financial results for the period ending April 28, 2024, it stated that the Company's revenue "increased 10% to $2.2 billion" and income from operations "increased 8% to $432.6 million." The press release further stated, in pertinent part:

> *Guests responded well to our product innovations across categories, and we are pleased by the progress we are making to optimize our U.S. product assortment.* Looking ahead, we continue to have a significant runway for growth and are confident in our team's ability to powerfully deliver for our guests in 2024 and beyond.

100.    On June 5, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the period ending April 28, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q included a purported warning regarding risks to the Company, stating, in pertinent part:

> *If* we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

101.    The 1Q24 10-Q further asserted that the Company effectively manages inventory allocation, stating in relevant part:

> *The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed.* Our inventory balance as of April 28, 2024 was $1.3 billion, a decrease of 15% from April 30, 2023.

102.    On July 24, 2024, at approximately 3:05 p.m. Eastern, Bloomberg analysts reported that Lululemon's new Breezethrough leggings launch was "raising concerning", noting that the launch had suffered from "inconsistent" inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line," suggesting "ongoing allocation-related issues."

103.    On this news, the Company's stock price fell $9.31, or 3.3%, to close at $272.06 per share on July 24, 2024, on unusually heavy trading volume.

104.    On July 25, 2024, before the market opened, Bloomberg reported that a Lululemon spokesperson told the agency that the Company "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience."

105.    On this news, the Company's share price fell $24.74, or 9.09%, to close at $247.32 per share on July 25, 2024, on unusually heavy trading volume.

### IN REPURCHASING STOCK, LULULEMON RELIED ON THE INDIVIDUAL DEFENDANTS' FALSE OR MISLEADING STATEMENTS

106.    In purchasing common stock in connection with the stock repurchase program, Lululemon relied on the Individual Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224

(1988), and *Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

107. Throughout the Relevant Period, Lululemon justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. Lululemon would not have purchased its securities at artificially inflated prices had the Individual Defendants disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by Lululemon should be presumed with respect to the Individual Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

108. Additionally, the "fraud on the market" presumption applies to the Individual Defendants' misstatements of material facts or failures to disclose material facts.

109. At all relevant times, the market for Lululemon stock was efficient market for the following reasons, among others:

    a. Lululemon stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

    b. As a regulated issuer, Lululemon filed periodic public reports with the SEC and the Nasdaq;

    c. Lululemon regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.  Lululemon was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

e.  The market price of Lululemon's stock reacted rapidly to new information entering the market.

110.    As a result of the foregoing, the market for Lululemon stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Lululemon's common stock. The foregoing facts indicate the existence of an efficient market for trading of Lululemon's stock and support application of the fraud-on-the-market doctrine.

111.    Lululemon relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Individual Defendants' misstatements and omissions alleged herein.  Had Lululemon known of the material adverse information not disclosed by the Individual Defendants or been aware of the truth behind the Individual Defendants' material misstatements, the Company would not have purchased Lululemon stock at artificially inflated prices.

### NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE INDIVIDUAL DEFENDANTS' MISREPRESENTATIONS

112.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather,

they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

113.    Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Lululemon or an Individual Defendants who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## INSIDER SELLING

114.    Before the full disclosure by Lululemon and understanding by the market of the underperformance of the Breezethrough product launch Defendants McDonald and Frank ("Insider Trading Defendants") sold 26,533 shares while in possession of material non-public information regarding the Company's business growth.

115.    Defendant McDonald sold 25,000 Lululemon shares, while the price of the

Company's stock was artificially inflated for approximately $12,437,539 in proceeds while in possession of material, non-public information. As CEO, Defendant McDonald knew the truth about the shortcomings of the Breezethrough product launch.

116.    Defendant Frank sold 1,553 Lululemon shares, while the price of the Company's stock was artificially inflated for approximately $776,500 in proceeds while in possession of material, non-public information. As CFO, Defendant McDonald knew the truth about the shortcomings of the Breezethrough product launch.

117.    The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

118.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

119.    The Individual Defendants breached their fiduciary duties to Lululemon because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch: (1) that the Company was struggling with inventory allocation issues and color palette execution issues; (2) that, as a result, the Company's Breezethrough product launch underperformed; and (3) that, as a result of the foregoing, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

120.    In purchasing common stock in connection with the stock repurchase program,

Lululemon relied on the Individual Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

121.    Throughout the Relevant Period, Lululemon justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. Lululemon would not have purchased its securities at artificially inflated prices had the Individual Defendants disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by Lululemon should be presumed with respect to the Individual Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

122.    Additionally, the "fraud on the market" presumption applies to the Individual Defendants' misstatements of material facts or failures to disclose material facts.

123.    At all relevant times, the market for Lululemon stock was an efficient market.

124.    As a result of the foregoing, the market for Lululemon stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Lululemon's common stock. The foregoing facts indicate the existence of an efficient market for trading of Lululemon's stock and support application of the fraud-on-the-market doctrine.

125.    Lululemon relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Individual Defendants' misstatements and omissions alleged herein.  Had Lululemon known of the material

adverse information not disclosed by the Individual Defendants or been aware of the truth behind the Individual Defendants' material misstatements, the Company would not have purchased Lululemon stock at artificially inflated prices.

## DAMAGES TO LULULEMON

126.    As a direct and proximate result of the Individual Defendants' misconduct, Lululemon has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

127.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

129.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

130.    As a direct and proximate result of the Individual Defendants' actions, Lululemon has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

132.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

133.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

134.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

135.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

136.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

137.    The Company's Board is currently comprised of eleven members: Defendants McDonald, Morfitt, Mussafer, Casey, Grant, Henry, Loehnis, Mahe, McNeill,  White, and List (the "Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Defendants, *i.e.*, six, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

138.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

139.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant McDonald**

140.    Defendant McDonald is not disinterested or independent, and therefore, is incapable of considering demand because, McDonald is, and was at all relevant times, an employee (CEO since August 2018) who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

141.    The lack of independence and financial benefits received by McDonald renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

142.    In addition, McDonald is a defendant in the Securities Class Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

143.    Furthermore, the Company's 2024 Proxy concedes that McDonald is not an independent director.

144.    As such, Defendant McDonald cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Casey, Morfitt, Grant, Henry, Loehnis, and List**

145.    Defendants Casey (Chair), Morfitt, Grant, Henry, Loehnis, and List are not disinterested or independent, and therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless regard these Defendants cause these improper statements.

146.    For these reasons, Casey (Chair), Morfitt, Grant, Henry, Loehnis, and List breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore excused.

147.    The Directors, as members of the Board, were and are subject to the Code of Business Conduct and Ethics, which go well beyond the basic duties required by applicable laws, rules, and regulations.  Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Code of Conduct and Code of Ethics, face substantial liability, and are not independent or disinterested, making demand upon them futile.

148.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors

44

have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct.  Thus, any demand upon the Directors would be futile.

149.    Lululemon has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lululemon any part of the damages Lululemon suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Lululemon's officers and directors, and these acts are incapable of ratification.

152.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Lululemon. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Lululemon, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Directors will not cause Lululemon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### Against the Individual Defendants

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lululemon's business and affairs.

157.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Lululemon's shareholders.

158.    In breach of their fiduciary duties owed to Lululemon, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

159.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Lululemon's securities.

160.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

161.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lululemon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### Against the Insider Trading Defendants

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    At the time that the Insider Trading Defendants sold their Lululemon stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

165.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Lululemon stock.

166.    The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

167.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, any profits made by the Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT III

### Violations of Section 14(a) of the Exchange Act
### Against the Director Defendants

168.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully

set forth herein.

169.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or
> instrumentality of interstate commerce or of any facility of a national
> securities exchange or otherwise, in contravention of such rules and
> regulations as the [SEC] may prescribe as necessary or appropriate in the
> public interest or for the protection of investors, to solicit or to permit the use
> of his name to solicit any proxy or consent or authorization in respect of any
> security (other than an exempted security) registered pursuant to section 12
> of this title [15 U.S.C. § 78l].

170.    Rule 14a-9, provides that no proxy statement shall contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

171.    Under the direction and watch of the Director Defendants, the Company made

materially misleading statements in its Annual Proxy filed with the SEC on April 25, 2024 (the

"Proxy").  Specifically, the Proxy contained false statements and failed to disclose that (i) the

Company was facing challenges with inventory allocation and issues in executing its color palette;

(ii) that, as a result, the Company's Breezethrough product launch underperformed; (iii) due to

these issues, the Company was experiencing stagnant sales in the Americas region; and (iv) as a

result, Defendants' positive statements about the Company's business, operations, and prospects

were materially misleading and/or lacked a reasonable basis.

172.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

173.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

174.    Plaintiff has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment Against
### The Individual Defendants

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Lululemon.

177.    Each of the Defendants received payment from Lululemon, in the form of either salary or director fees while actively breaching their fiduciary duties to Lululemon.

178.    All the payments and benefits provided to defendants were at the expense of Lululemon. The Company received no benefit from these payments.

179.    Plaintiff, as a shareholder and a representative of Lululemon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

180.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT V

**Waste of Corporate Assets
Against the Individual Defendants**

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Lululemon to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

183.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT VI

**Against Individual Defendants for Violations of Section 10(b) of the Exchange Act
and SEC Rule 10(b)-5**

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    During the Relevant Period, the Individual Defendants disseminated or approved materially false and misleading public statements in regard to (i) challenges with inventory allocation and issues in executing its color palette; (ii) the Company's Breezethrough product launch underperformed; and (iii) the Company's stagnant sales in the Americas region. As a result, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Thus, the price of the Company's shares was

51

artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

187.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lululemon, their control over, and/or receipt and/or modification of Lululemon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lululemon, participated in the fraudulent scheme alleged herein.

188.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Induvial Defendants.

189.    The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

190.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, the Induvial Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

191.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

192.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; and

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## <u>COUNT VII</u>

**Against Defendants McDonald and Frank for Violations of Section 20(a) of the Exchange Act**

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    This Count is asserted on behalf of the Company against Defendants McDonald and Frank for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

195.    Defendants McDonald and Frank are a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of thier control, Defendants McDonald and Frank had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein. Defendants McDonald and Frank were able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the time period in issue, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

196.    In their capacity as senior executives, Defendants McDonald and Frank had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendants McDonald and Frank agreed with his/her course of conduct.

197.    As a result of the foregoing, Defendants McDonald and Frank, individually, were controlling persons of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

198.    As a direct and proximate result of Defendants McDonald's and Frank's conduct, the Company suffered damages in connection with its purchase of Lululemon common stock at materially inflated prices.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of Lululemon and that Plaintiff is an adequate representative of the Company;

54

b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lululemon;

c)      Determining and awarding to Lululemon the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Lululemon's corporate governance and internal procedures to comply with applicable laws and to protect Lululemon and its shareholders from a repeat of the damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2024                    **RIGRODSKY LAW, P.A.**

By: */s/ Timothy J. MacFall*

Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

*Counsel for Plaintiff*